UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CURO HEALTH SERVICES, LLC, and HOSPICE OF MAINE, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ERICA LILLY, BRISTOL HOSPICE, LLC and BRISTOL HOSPICE – BANGOR, LLC <br><br> Defendants. | CIVIL ACTION <br> Docket No: |

## VERIFIED COMPLAINT AND JURY DEMAND

Plaintiffs CURO HEALTH SERVICES, LLC, and HOSPICE OF MAINE, LLC, both of which do business as Gentiva (collectively "**Gentiva**") by and through their undersigned attorneys, Pierce Atwood LLP, as and for their Verified Complaint and Jury Demand, complain as follows:

## PARTIES

1.    Plaintiff Curo Health Services, LLC is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Georgia.

2.    Plaintiff Hospice of Maine, LLC, is a subsidiary of Gentiva and a limited liability company organized under the laws of the State of Delaware with a principal place of business in Georgia.

3.    On information and belief, Defendant Erica Lilly ("**Lilly**") is a natural person who resides in the State of Maine.

4.    On information and belief, Bristol Hospice, LLC ("**Bristol Hospice**"), is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Utah.

5.      On information and belief, Bristol Hospice - Bangor, LLC ("**Bristol Bangor**")

(Bristol Hospice and Bristol Bangor shall hereafter be referred to, collectively, as

"**Bristol**"), is a limited liability company organized under the laws of the State of

Delaware with a principal place of business in Utah.

## JURISDICTION AND VENUE

6.      This Court may exercise subject matter jurisdiction over this action pursuant to 28

USC § 1331, because this action arises under the laws of the United States, and

pursuant to 18 USC § 1836(c), because this action arises under the Defend Trade

Secrets Act of 2016.

7.      The Court may exercise personal jurisdiction over all Defendants because they reside

or have sufficient minimum contacts in this judicial district and their numerous acts

of wrongdoing took place within this judicial district.

8.      The United States District Court for the District of Maine is the appropriate venue

for this action under 28 U.S.C. § 1391 because it is a judicial district where a

substantial part of the events giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

I.      *Gentiva and Bristol*

9.      Both Gentiva and Bristol are nationwide healthcare organizations providing hospice

and other healthcare services to individuals across the United States.

10.     Both Gentiva and Bristol obtain and identify their clients and patients through

referral sources, such as hospitals, residential facilities, nursing homes, as well as

other healthcare facilities.

11.     Over many years of working together, Gentiva has developed strong business relationships with such referral sources, resulting in either contractual or advantageous relationships between Gentiva and those referral sources.

12.     Employees and agents of those referral sources identify individuals who they believe either need or could benefit from hospice care and refer those individuals to certain agencies, such as Gentiva and Bristol, for those services.

13.     In or around 2020, Gentiva began operating in the State of Maine.

14.     On information and belief, in or around the summer of 2024, Bristol began operations in the State of Maine.

15.     Gentiva and Bristol are competitors in the field of providing hospice care to individuals throughout the State of Maine.

## II.    *Erica Lilly's Employment with Gentiva*

16.     Erica Lilly is a registered nurse in the State of Maine.

17.     In or around July 2022, Lilly submitted an application for the position of Administrator RN at a Gentiva facility in Brewer, Maine, Kindred at Home.

18.     On or about August 1, 2022, Gentiva offered Lilly the position of Administrator RN, with a start date of August 15, 2022, based in Brewer Maine.

19.     As Administrator RN for Gentiva, Lilly performed or was expected to perform the job duties set forth in the Administrator RN job description.

20.     A true and accurate copy of the Administrator RN job description, as of August 2022, is attached hereto as **Exhibit A**.

21.     As Administrator RN, Lilly was an officer of Gentiva's Maine operation.

22.     As part of her job as Administrator RN, Lilly had access to a significant amount of Gentiva's confidential and proprietary information, including, without limitation, lists

of referral sources with information about referral history with Gentiva, lists of Gentiva patients and clients and their medical issues/private personal information, Gentiva's confidential business plans, Gentiva's confidential trainings, policies, and procedures, Gentiva electronic systems and software, protected Gentiva personnel information, including social security numbers, payroll records, and other human resources materials and records, as well as Protected Health Information ("PHI") for Gentiva's patients, among other types of information.

23.    Gentiva employs significant measures to protect this information including, without limitation, cybersecurity software,  data loss protection tools, disablement of USB drives on company computers, programs and training for its electronic systems, having certain employees sign confidentiality and non-disclosure agreements, installing extensive physical security measures at Gentiva facilities, implementing various levels of password protection for Gentiva's electronic systems,  as well as only allowing need-to-know access to information for certain job titles.

24.    Gentiva's offer of employment to Lilly was made contingent upon, among other things, Lilly's agreement to Gentiva's Noncompetition, Nonsolicitation, and Confidentiality Agreement.

25.    On August 5, 2022, Lilly executed Gentiva's Noncompetition, Nonsolicitation, and Confidentiality Agreement, as well a Confidentiality Attestation.

26.    A true and correct copy of Gentiva's Confidentiality Attestation and Noncompetition, Nonsolicitation, and Confidentiality Agreement, with Lilly's signature, are attached hereto as **Exhibit B**, which shall hereafter be referred to as the "Agreement".

27.     Prior to offering Lilly employment with Gentiva, Gentiva notified Lilly that her employment was conditioned on her signing the Agreement.

28.     Gentiva provided Lilly with a draft of the Agreement more than three (3) business days before Gentiva required Lilly to sign the agreement

29.     By signing the Agreement, Lilly agreed to the terms therein.

30.     The Agreement is a binding contract between Gentiva and Lilly.

31.     In the Agreement, Lilly agreed to the following:

   a.   During and after the termination of her employment from Gentiva, to maintain the confidentiality of any of Gentiva's Confidential Information;

   b.   During and after the termination of her employment from Gentiva, to take all necessary and appropriate steps to safeguard Gentiva's Confidential Information and to protect it against disclosure or misuse;

   c.   To return all of Gentiva's Confidential Information, among other things, upon the termination of her employment from Gentiva;

   d.   To refrain from disclosing Gentiva's Confidential Information to any person or entity other than Gentiva;

   e.   To refrain from "be[ing] employed by or perform[ing] any work for hire that is the same or similar to the work performed for [Gentiva] . . . for a[n] entity that offers hospice care" within a "seventy-five (75) mile radius from any [Gentiva] location or program to which [Ms. Lilly] was assigned."

   f.   To refrain from soliciting Gentiva's employees to leave their employment with Gentiva for a period of eighteen (18) months following the termination of her employment from Gentiva; and

g. To refrain from soliciting Gentiva's customers, patients, or referral sources to cease or reduce their business with Gentiva or send business to a competitor of Gentiva.

32. On August 11, 2022, Lilly signed Gentiva's offer letter, accepting the offer of employment.

33. On or about August 15, 2022, Lilly began her employment with Gentiva as an Administrator RN assigned to Gentiva's Brewer, Maine facility.

34. Lilly remained an employee with Gentiva, assigned to its Brewer, Maine facility, until April 2024.

35. During her employment, Lilly had material business-related contact and interaction with several employees, patients, and referral sources, such as those specifically identified throughout this Complaint.

36. Lilly's material contact with the above-referenced referral sources included frequent communications with clinical and non-clinical staff of those facilities about potential patients to be referred to Gentiva, patient needs, logistical issues regarding potential patients of Gentiva, among other things.

37. On April 11, 2024, Lilly informed Gentiva that she intended to resign her employment, effective May 2, 2024.

38. On April 13, 2024, Theresa Nadeau-Stack called Lilly to inform her that it had accepted her resignation, effective immediately. When Lilly did not answer, Ms. Nadeau-Stack left a voicemail message stating that it accepted her resignation, that Lilly was not to return to Gentiva's premises until Gentiva had arranged an opportunity for Lilly to collect her belongings; and further reminded Lilly of her obligations under the Agreement.

39.   Because Gentiva was unable to reach Lilly, Gentiva was unable to process Lilly's resignation or terminate her access to Gentiva's electronic systems until April 15, 2024.

40.   Therefore, in Gentiva's electronic systems, Lilly technically remained an employee of Gentiva until April 15, 2024.

III.   *Lilly's Unlawful Activities in the Days Following Her Notice of Resignation.*

41.   On or about April 13, 2024, approximately one hour after Ms. Nadeau-Stack left Lilly the voicemail message described in paragraph 38 herein, Lilly traveled arrived at Gentiva's Brewer facility.

42.   That same day, Brittany Woods, patient care manager at Gentiva, observed Lilly arriving at Gentiva's Brewer facility with another individual.

43.   Ms. Woods observed Lilly arrive in a truck and, with the individual who accompanied her, remove property from the facility, and place the property in the truck.

44.   Ms. Woods contacted Gentiva management to inform them that Lilly was removing Gentiva property from its Brewer facility.

45.   Approximately thirty minutes later, Alicia Gilmore, Gentiva's regional Area Director of Business Development, arrived at Gentiva's Brewer facility.

46.   Ms. Gilmore noticed that the rear door to Gentiva's Brewer facility was propped open, thereby creating a substantial risk to patient and business confidentiality.

47.   After inspecting the premises, Ms. Gilmore discovered that numerous binders containing confidential and proprietary information had been removed from a shelf where they previously were located.

48. The empty binders were subsequently found in the dumpster; however, it appeared Lilly had removed and retained the entire contents of the binders, which included proprietary and confidential business and patient information.

49. Among the emptied binders were those labeled "COVID-19," "Contract Binder: Facilities," and "Complaint Binder 2022."

50. On information and belief, Lilly removed confidential and proprietary information of Gentiva, and its current and prospective patients and Referral Sources, for her own use, with the intention of either harming Gentiva or aiding competition against Gentiva, and in violation of her contractual and legal obligations to Gentiva.

51. That confidential and proprietary information removed by Lilly included, without limitation, confidential and proprietary patient and referral lists (including identifying information, social security numbers, pricing, PHI, among other things), confidential patient complaints or reports, Gentiva business plans, Gentiva pricing information, confidential business contracts and agreements, documents regarding Gentiva marketing and business strategies.

52. On or about April 14, 2024, Lilly, without authorization, accessed Gentiva's electronic systems and altered the employment status for three Gentiva employees to falsely indicate that those employees had been terminated.

53. When altering the employment status of these individuals, Lilly noted that their terminations were due to an "involuntary reduction in force/branch closure."

54. Lilly's unauthorized access and alteration of Gentiva's personnel information caused these employees, who work directly with patients and clients, to temporarily lose access to Gentiva's facilities and electronic systems, creating a potential patient safety risk.

55.     On information and belief, by engaging in the conduct described above, Lilly intended to cause harm to Gentiva, its employees and its patients.

56.     On or about April 15, 2024, upon discovering what Lilly had done, as described above, Gentiva corrected its electronic system to indicate that the three affected employees were, in fact, active employees of Gentiva.

57.     By the time Gentiva had corrected the issue, those employees had been without access to Gentiva's electronic systems for several hours.

58.     On April 15, 2024, Gentiva's IT Department confirmed via email that it had terminated Lilly's system access, and Gentiva processed and finalized Lilly's termination.

## IV.     *Lilly's Employment with Bristol and Unlawful Solicitation of Gentiva Employees*

59.     On information and belief, within a month of her resignation from Gentiva, Lilly became an employee of Bristol, based in Bangor, Maine, and has remained a Bristol employee since that time.

60.     Bristol's Bangor, Maine location is less than five (5) miles from Gentiva's Brewer, Maine location.

61.     On information and belief, Lilly is a Hospice Executive Director for Bristol in Maine.

62.     On information and belief, as Hospice Executive Director for Bristol in Maine, Lilly's job duties are substantially similar to those she performed during her employment with Gentiva.

63.     On information and belief, in her role as Hospice Executive Director for Bristol in Maine, Lilly has regularly used Gentiva's trade secrets, confidential and proprietary information for the benefit of Bristol and to the detriment of Gentiva.

64.     On information and belief, in her role as Hospice Executive Director for Bristol in Maine, Lilly has, without authorization of Gentiva and to the detriment of Gentiva, shared Gentiva's trade secrets, confidential and proprietary information with other Bristol employees

65.     On information and belief, Lilly's use for Bristol's benefit and to the detriment of Gentiva has included, without limitation: (i) using Gentiva's patient and referral lists, history and records to solicit and acquire patient referrals that would otherwise have been referred to Gentiva; (ii) adjusting and setting pricing or benefits to current and prospective patients and referral sources of Bristol by using Gentiva's confidential pricing and business information as a baseline or guideline for pricing in various geographic regions in Maine; (iii) using Gentiva's patient, referral and business information to identify specific target referral sources and patients for Bristol; (iv) communicate and strategize adding or adjusting various offerings by Bristol in Maine by using Gentiva's business plans and pricing information as guides and sources of ideas, proposals and plans; (v) adopting for her own personal use and the use of Bristol, various proprietary and confidential contracts, forms, and other patient documents that have been written and used by Gentiva.

66.     On information and belief, Lilly works with other Bristol employees in servicing and soliciting referral sources for potential hospice patients for Bristol.

67.     Following her resignation from Gentiva, and in the course and scope of her employment with Bristol, Lilly directly or indirectly contacted numerous employees of Gentiva on Bristol's behalf, for the specific purpose of inducing them to leave their employment at Gentiva and become employees at Bristol.

68.     Lilly contacted Gentiva employee, Brittany Woods, to inform Ms. Woods that Lilly had moved to Bristol and told Ms. Woods "because of my noncompete I won't be able to recruit myself so if someone else calls answer the phone."

69.     Lilly told Ms. Woods that Bristol was "building out" its team and would be "reaching out to good people."

70.     Lilly contacted Gentiva employee, Laura King, to ask if Ms. King could come to Bristol for a job interview.

71.     Lilly told Ms. King that Bristol would pay Ms. King a higher salary than Gentiva did and, generally, offered higher salaries for registered nurses.

72.     On information and belief, Lilly also contacted Gentiva employees Shalyn Lawson, Taylor Pelkey, Jennah Dalton, Thomas Columbe, Jessica Ranco, Danielle Bubar, Alyssa Collins, Erika Tripp, Eileen Hastings, Deb Stanley, Katie Hurley, and Emily McCausland for the specific purpose of soliciting them to end their employment with Gentiva and become employed by Bristol.

73.     Lilly moreover indirectly recruited Gentiva employees in concert with former Gentiva employee George Schiavo.

74.     Lilly shared with Schiavo a list of Gentiva employees, which Gentiva considered confidential, that Lilly and Schiavo then used to contact and recruit Gentiva employees to become employed by Bristol.

75.     In or around the week following her resignation date, Lilly contacted Gentiva employees Melissa Boudreau, Crystal Clarke, and Breanna Bowman, for the purpose of soliciting them to resign from Gentiva and become employed by Bristol.

76.     Due to Lilly's efforts, Ms. Boudreau, Ms. Clarke and Ms. Bowman each gave notice of their resignation to Gentiva within a week of Lilly's resignation date.

77.     Due to Lilly's efforts, Ms. Boudreau, Ms. Clarke and Ms. Bowman are currently all employees of Bristol.

78.     On information and belief, in the weeks following her resignation from Gentiva, Lilly contacted Christopher Parker, Gentiva's then-bereavement coordinator, for the purpose of soliciting him to leave Gentiva and become employed by Bristol.

79.     On information and belief, due to Lilly's efforts, Mr. Parker gave notice of his resignation to Gentiva on June 13, 2024, citing higher pay and Bristol's unfair treatment of Lilly as his reasons for resigning.

80.     On information and belief, due to Lilly's efforts, Mr. Parker is currently employed by Bristol.

81.     On June 14, 2024, legal counsel for Gentiva directly contacted Bristol's legal counsel to inform him of Gentiva's concerns regarding Lilly's breach of the Agreement, and that Bristol was ignoring the violations of Lilly and other Gentiva employees of Gentiva's post-employment covenants, similar to those set forth in the Agreement.

82.     Bristol responded the same day stating that it would inquire into potential violations of the Agreement by Bristol employees, including Lilly.

83.     On June 24, 2024, Bristol again responded to Gentiva's email regarding violations of the Agreement, stating that it had addressed Gentiva's concerns with its employees.

84.     A true and accurate copy of the email exchange between Gentiva's counsel and Bristol's counsel is attached as **Exhibit C**.

## V.      *Lilly and Bristol Begin a Focused Effort to Divert Referrals Away from Gentiva and to Bristol by Making Fraudulent Statements About Gentiva*

85.     Despite the representations of Bristol's legal counsel, as well as Bristol's knowledge that Lilly was breaching the Agreement, Lilly's actions have continued to escalate.

86.     Most recently, Lilly and other Bristol employees, on behalf of Bristol, have contacted various referral sources of Gentiva for the purpose of soliciting referrals away from Gentiva and for the benefit of Bristol.

87.     Lilly and other Bristol employees, on behalf of Bristol, have made false representations regarding Gentiva's business operations to those referral sources for the specific purpose of inducing them to terminate their business relationship with Gentiva and send clients, patients and other referrals to Bristol.

88.     On information and belief, at all relevant times hereto, Bristol is aware and has been aware that Lilly and other Bristol employees have (i) called upon and solicited these referral sources and (ii) made false statements about the ethics, business plans, referral plans, viability, and staffing levels of Gentiva for the purpose of soliciting these referral sources.

89.     On information and belief, Bristol has provided substantial resources and compensation to Lilly and other Bristol employees for the purpose of encouraging and aiding the tortious efforts of those employees described above, including: (i) reimbursement for travel expenses to and from referral sources that have a business relationship with Gentiva; (ii) pamphlets, gifts, resource material for Lilly and other Bristol employees to provide to those referral sources; (iii) reimbursement for expenses incurred by Lilly and other Bristol employees related to purchasing food, coffee, and other offerings to those referral sources; (iv) bonus or commission payments to Bristol employees for securing referrals from those referral sources.

90.     On or about November 1, 2024, Lilly, individually and on behalf of Bristol, falsely told Irene Myers, a social worker at MaineHealth Waldo Hospital, that Gentiva had closed admissions to referrals and requested that referrals be deferred to Bristol.

91.     On information and belief, Lilly made this statement with the intention of inducing MaineHealth Waldo Hospital to stop referring patients to Gentiva and refer any other patients to Bristol.

92.     On or about November 4, 2024, Bristol employee Griffin Madore ("Madore"), individually and on behalf of Bristol, falsely told a social worker at Bangor Nursing and Rehabilitation that Gentiva was closing its Maine operations and requesting that patients be referred to Bristol.

93.     On information and belief, Madore made this statement with the intention of inducing Bangor Nursing and Rehabilitation to stop referring patients to Gentiva and send any other referrals to Bristol.

94.     Madore also falsely told Miranda Clark, a Social Worker at Ross Manor, that Gentiva was closing its Maine operations and requesting that those referral sources refer patients to Bristol.

95.     On information and belief, Madore made this statement with the intention of inducing Ross Manor to stop referring patients to Gentiva and refer any other patients to Bristol.

96.     On November 5, 2024, Madore, on behalf of himself and Bristol, falsely told Carolyn Mumley, a social worker at Hibbard's Nursing, that Gentiva was closing its Maine operations and requesting that patients be referred to Bristol.

97.     On information and belief, Madore made this statement with the intention of inducing Hibbard's Nursing Home to stop referring patients to Gentiva and refer any other patients to Bristol.

98.     On November 8, 2024, Madore, on behalf of himself and Bristol, falsely told Ryan Stroud, the Director of Nursing at Dexter Health Care, that it seemed Gentiva was

closed to/not accepting referrals or intakes of patients and that Bristol would gladly accept any patient referrals.

99.     On information and belief, Madore made this statement with the intention of inducing Dexter Health Care to stop referring patients to Gentiva and refer any other patients to Bristol.

100.    In or around November 2024, Madore, on behalf of himself and Bristol, falsely told Ken Mitchell, Director of Nursing at Stillwater Healthcare, that Gentiva was closing its Maine operations and to refer any patients to Bristol.

101.    On information and belief, Madore made this statement with the intention of inducing Stillwater Healthcare to stop referring patients to Gentiva and refer any other patients to Bristol.

102.    In or around November 2024, Crystal Clark, former Gentiva employee and current Bristol employee, contacted Elizabeth Bailey, Resident Services Coordinator at Hilltop Manor and Pleasant Meadows in Dover-Foxcroft, Maine.

103.    Gentiva has had and continues to have a long-standing business relationship with Ms. Bailey, as well as Hilltop Manor and Pleasant Meadows, having provided services to many patients of those facilities.

104.    In or around November 2024, Gentiva employee Melanie Pomeroy visited Ms. Bailey at Pleasant Meadow Estates.

105.    During that visit, Ms. Bailey told Ms. Pomeroy that Pleasant Meadows and Hilltop Manor had begun referring patients to Bristol instead of Gentiva because Ms. Clark and other Bristol employees had made statements, on behalf of Bristol, that Bristol was "fully staffed" in the area and that Gentiva was not "fully staffed."

106.   Ms. Bailey said that, with those statements, it appeared to her that Ms. Clark and other Bristol employees implied that Gentiva was not able to handle patient referrals from Pleasant Meadows or Hilltop Manor, but that Bristol was able to do so.

107.   On information and belief, other Bristol employees who have contacted Ms. Bailey include Lilly and Madore.

108.   On November 18, 2024, Ms. Pomeroy received a call from a representative of Jem Estates in Corinth Maine, another facility that has regularly provided patient referrals to Gentiva over the years.

109.   In that call, the representative said Jem Estates would be referring a patient to hospice services with Gentiva.

110.   Later that same day, a different representative of Jem Estates called Ms. Pomeroy and said that Jem Estates would not refer that patient to Gentiva but was instead referring the patient to another hospice provider.

111.   Later that same day, Ms. Pomeroy visited Jem Estates and learned that Jem Estates was referring the patient to Bristol and, more specifically, Erica Lilly and former Gentiva employee, Melissa Boudreau.

112.   Ms. Pomeroy also witnessed Ms. Lilly and Ms. Boudreau speaking with the family of the patient in question, discussing the patient's referral to Bristol, Ms. Lilly's work with Bristol, as well as Jem Estates' decision to refer the patient to Bristol.

113.   On information and belief, Jem Estates' decision to refer this patient to Bristol and not Gentiva was due to, in whole or in part, Ms. Lilly's false statements that Gentiva is closed to admissions or closing its Maine operation and/or Gentiva has asked that all referrals be sent to Bristol.

114. The statements by Lilly and Bristol that Gentiva is closed to admissions, is going out of business, is closing is operations in Maine, or is otherwise winding down operations or lacks adequate staffing or resources to accept new patients are false.

115. The statements by Lilly and Bristol that Gentiva has requested that patient referrals be sent to Bristol are false.

116. Lilly, Bristol and Bristol's employees knew or should have known that the above statements are false and, by making them to Gentiva's referral sources, were acting either intentionally, recklessly or, at a minimum, negligently.

117. On information and belief, as a result of the false statements by Defendants and Lilly's violation of her Agreement, several referral sources have stopped referring patients to Gentiva and referred patients to Bristol that would otherwise have been referred to Gentiva, such as the patient of Jem Estates, as described above.

118. On information and belief, in reliance on the above-referenced false statements of Defendants, Jem Estates, Winterberry Heights Senior Living, Jed Prouty Assisted Living, Pleasant Meadows, Harbor Hill, and Hilltop Manor, among other nursing homes and healthcare facilities that have worked with Gentiva and/or have contractual relationships with Gentiva, have stopped referring patients to Gentiva and now send referrals to Bristol.

119. Several of the above-referenced facilities, including, without limitation, Waldo County Hospital, Bangor Nursing and Rehabilitation, Jem Estates, Winterberry Heights Senior Living, Jed Prouty Assisted Living, Pleasant Meadows, Hilltop Manor, Dexter Health Care, Hibbard Nursing, Ross Manor and Stillwater Rehab have worked with Gentiva, have regularly referred many patients to Gentiva, and have long-established business and/or contractual relationships with Gentiva.

120. Numerous facilities and providers throughout Maine have now heard the false statements, either from Lilly and Bristol directly or through word of mouth, that Gentiva is closed to admissions, closing its Maine operations, under-staffed, and/or sending all referrals to Bristol.

121. The false statements by Lilly and Bristol continue to spread throughout the community and continue to have a negative impact on confidence in Gentiva's operations and Gentiva's reputation.

122. As a result of the false statements by Defendants, Lilly's violation of the Agreement, as well as other wrongful conduct on behalf of Defendants, Gentiva has suffered damages in the form of, among other things, lost goodwill, lost public confidence, and lost referrals and clients, as well as monetary damages.

## COUNT 1 – BREACH OF CONTRACT
### (Against Lilly)

123. Gentiva incorporates all of the allegations of Paragraphs 1 through 122 as if set forth fully herein.

124. The Agreement described herein constitutes a valid and enforceable contract between Lilly and Gentiva.

125. As stated in the Agreement, Lilly agreed, among other things, that she would not

   a. Misuse or disclose Gentiva's Confidential Information, including but not limited to nonpublic information concerning Gentiva's employees, clients, patients, customers, or referral sources;

   b. Take all necessary and appropriate steps to safeguard Gentiva's Confidential Information and to protect it against disclosure;

    c.   To refrain from "be[ing] employed by or perform[ing] any work for hire that is the same or similar to the work performed for [Gentiva] . . . for a[n] entity that offers hospice care" within a "seventy-five (75) mile radius from any [Gentiva] location or program to which [Ms. Lilly] was assigned."

    d.   Directly or indirectly solicit customers, patients, referral sources, social workers, health care providers, or senior living facility representatives with whom she had material business-related contact during her employment to induce such persons to cease or reduce its business with Gentiva for a period of eighteen (18) months following her termination of employment with Gentiva; or

    e.   Directly or indirectly hire, employ, or solicit to leave their employment Gentiva employees with whom she worked for a period of eighteen (18) months following her termination of employment.

126.    Gentiva has complied with all of its obligations under the Agreement.

127.    As detailed above, Lilly has breached, and continues to breach, the Agreement, by, among other things,

- Misusing, retaining, and/or disclosing Gentiva's Confidential Information, including but not limited to, its employee lists and/or relationships, referral source lists and/or relationships, contracts, and other confidential and proprietary information;

- Directly or indirectly, and within the restricted time period specified in the Agreement, soliciting and/or calling on referral sources, as described above, with whom she had material business-related contact during her employment with Gentiva, for the purpose of diverting patient referrals to Bristol; and

- Directly or indirectly, and within the restricted time period specified in the Agreement, soliciting Gentiva employees, as described above, to leave their employment with Gentiva and instead provide services for Bristol.

- Working as an employee of Bristol – a direct competitor of Gentiva – within 75 miles of Gentiva's Brewer, Maine location, within the restricted time-period specified in the Agreement (i.e., six months following termination of employment), and in a role substantially similar to the role she held while employed by Gentiva.

128. As a direct and proximate result of Lilly's breaches of the Agreement, Gentiva has suffered and will continue to suffer irreparable harm, as well as substantial monetary damages.

129. Pursuant to the Agreement, Gentiva is entitled to injunctive relief, reasonable attorneys' fees and costs incurred in connection with this action. (**Exhibit B ¶** 4(d)(ii).)

130. Gentiva has sustained actual losses, including expenditures of money to address and remediate Lilly's wrongdoing, as well as losses that cannot be adequately remedied with a money award.

## COUNT 2 – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### (Against Lilly and Bristol)

131. Gentiva incorporates all of the allegations of Paragraphs 1 through 130 as if set forth fully herein.

132. Gentiva had a valid contract, business relationship, or prospective economic advantage with employees.

133.     Gentiva had a valid contractual and/or business relationships, or prospective economic advantages with third parties, including but not limited to the referral sources described herein and patients of those referral sources.

134.     Defendants intentionally interfered with those contractual and/or business relationships, or prospective economic advantages through fraud by their conduct described above.

135.     Lilly acted on behalf of and for the benefit of Bristol, and in the scope of their job duties as employees of Bristol, when engaging in the above-referenced fraudulent conduct and untrue statements.

136.     Lilly's actions to interfere with Gentiva's contractual or advantageous relationships, as described above, were taken within the course and scope of their employment with Bristol.

137.     Accordingly, Bristol is liable for tortious interference with a business relationship under the laws of vicarious liability, including the doctrine of respondeat superior.

138.     As a direct and proximate result of Defendants' interference, Gentiva has suffered and will continue to suffer irreparable harm, as well as actual losses, including expenditures of money to address and remediate Lilly's wrongdoing.

### COUNT 3 – VIOLATION OF THE DEFEND TRADE SECRETS ACT OF 2016 ("DTSA")
**(Against Lilly)**

139.     Gentiva incorporates all of the allegations of Paragraphs 1 through 138 as if set forth fully herein.

140.     The DTSA, 18 U.S.C. § 1836 *et seq.*, prohibits the misappropriation of Gentiva's trade secrets and imposes both civil and criminal penalties for such misappropriation.

141.  As described herein, Lilly misappropriated Gentiva's trade secrets when, on at least two occasions following the termination of her employment, Lilly removed confidential Gentiva files, including PHI of Gentiva patients, client lists, business plans, contracts, and financial information, without Gentiva's authorization and in violation of her contractual promises, and when she kept and retained those files for her use and benefit and/or in connection with her employment with Bristol.

142.  Lilly's actions, as described herein, constitute "misappropriation" by "improper means" under 18 U.S.C. § 1839(5)(A).

143.  The files Lilly misappropriated, as described herein, constitute "trade secrets" of Gentiva under 18 U.S.C. § 1839(3).

144.  The trade secrets Lilly misappropriated, as described herein, are related to the products and services Gentiva offers, or intends to offer, in interstate commerce.

145.  Lilly's actions, as described herein, were "willful and malicious" under 18 U.S.C. § 1839(b)(3)(C).

146.  As a result of Lilly's willful and malicious misappropriation of Gentiva's trade secrets, Gentiva has sustained actual losses, including expenditures of money to address and remediate Lilly's wrongdoing, as well as losses that cannot be adequately remedied with a money award.

### COUNT 4 - VIOLATION OF THE MAINE UNIFORM TRADE SECRETS ACT ("MUTSA")
### (Against Lilly)

147.  Gentiva incorporates all of the allegations of Paragraphs 1 through 146 as if set forth fully herein.

148.  The MUTSA, 10 M.R.S. Ch. 302, prohibits the misappropriation of Gentiva's trade secrets.

149.   As described herein, Lilly misappropriated Gentiva's trade secrets when, on at least two occasions following the termination of her employment, Lilly copied confidential Gentiva files, including PHI of Gentiva patients, client lists, business plans, contracts, and financial information, without Gentiva's authorization and in violation of her contractual promises, and when she kept and retained those files for her use and benefit and/or in connection with her employment with Bristol.

150.   Lilly's actions, as described herein, constitute "misappropriation" by "improper means" under 10 M.R.S. §§ 1542(1) and (2).

151.   The files Lilly misappropriated, as described herein, constitute "trade secrets" of Gentiva under 10 M.R.S. § 1542(4).

152.   Lilly's actions, as described herein, were "willful and malicious" under 10 M.R.S. § 1544(2).

153.   As a result of Lilly's willful and malicious misappropriation of Gentiva's trade secrets, Gentiva has sustained actual losses, including expenditures of money to address and remediate Lilly's wrongdoing, as well as losses that cannot be adequately remedied with a money award.

## COUNT 5 – BREACH OF DUTY OF LOYALTY
### (Against Lilly)

154.   Gentiva incorporates all of the allegations of Paragraphs 1 through 153 as if set forth fully herein.

155.   Lilly was an employee and officer of Gentiva until April 15, 2024.

156.   Due to Lilly's roles as an employee and officer of Gentiva, Lilly owed Gentiva a fiduciary duty of loyalty.

157.   By removing and misappropriating Gentiva confidential and proprietary information for her own benefit and to the detriment of Gentiva, while she was still a Gentiva employee and officer, Lilly breached her fiduciary duty of loyalty to Gentiva.

158.   By accessing Gentiva's electronic systems and changing the employment status of three Gentiva employees for the specific purpose of causing harm to Gentiva and its employees, while she was still a Gentiva employee and officer, Lilly breached her fiduciary duty of loyalty to Gentiva.

159.   Through other conduct of Lilly while an employee and officer of Gentiva, as described above, Lilly breached her fiduciary duty of loyalty to Gentiva.

160.   Due to Lilly's breach of her fiduciary duty of loyalty to Gentiva, Gentiva has sustained actual losses, including expenditures of money to address and remediate Lilly's wrongdoing, as well as losses that cannot be adequately remedied with a money award.

## COUNT 6 – DEFAMATION
### (Against Lilly and Bristol)

161.   Gentiva incorporates all of the allegations of Paragraphs 1 through 160 as if set forth fully herein.

162.   As described above, Lilly and other employees of Bristol, in the scope of their duties as Bristol employees and with the authorization of Bristol, intentionally or recklessly made various unprivileged, false and defamatory statements about Gentiva and the viability of Gentiva's operation.

163.   As described above, Lilly and other employees of Bristol, in the scope of their duties as Bristol employees and with the authorization of Bristol, intentionally or recklessly

published those false statements to third parties either in writing, over the phone and in person.

164.     Accordingly, Bristol is liable for defamation under the laws of vicarious liability, including the doctrine of respondeat superior.

165.     Gentiva suffered special harm due to the false statements described above in the form of lost good will, lost business opportunities, financial loss, as well as other reputational harm that cannot be adequately remedied with a money award.

## COUNT 7 – AIDING AND ABETTING TORTIOUS CONDUCT
### (Against Bristol)

166.     Gentiva incorporates all of the allegations of Paragraphs 1 through 165 as if set forth fully herein.

167.     On information and belief, at all relevant times hereto, Bristol had actual knowledge of the tortious conduct engaged in by Lilly and other Bristol employees, as described herein.

168.     On information and belief, at all relevant times hereto, knowing of the tortious conduct engaged in by Lilly and other Bristol employees, Bristol provided substantial assistance to Lilly and other Bristol employees in the commission of their tortious conduct.

169.     Due to Bristol's aiding and abetting of the tortious conduct of Lilly and other Bristol employees, Gentiva has sustained actual losses, including expenditures of money to address and remediate Bristol's wrongdoing, as well as losses that cannot be adequately remedied with a money award.

## PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL

WHEREFORE, Gentiva requests a trial by jury, and that the Court enter judgment against Defendants awarding:

1.    Judgment in favor of Plaintiffs on all counts;

2.    Temporary, preliminary, and permanent injunctive relief against Defendants in which the Court orders as follows:

   a.    An order that Lilly cease employment with Bristol for a period of six (6) months from the date on which Lilly most recently breached the Agreement;

   b.    An order that Lilly comply with the remaining terms of the Agreement for the time limits set forth therein, beginning on the date Lilly most recently breached the Agreement, including, without limitation, Lilly's compliance with (i) the non-solicitation obligations under the Agreement and (ii) the confidentiality obligations under the Agreement;

   c.    An order enjoining Lilly from providing any services to any current, former, or prospective clients or referral sources of Gentiva, including but not limited to those specifically described in this Complaint, for a period of eighteen (18) months following the issuance of an injunction by this Court;

   d.    An order enjoining Lilly from providing any services to any person or entity that is engaged or intends to become engaged in business substantially similar to Gentiva's business within a 75 mile radius of any Gentiva facility in which Lilly had substantial contact, for a period of six (6) months following the issuance of an injunction by this Court;

   e.    An order enjoining Lilly from soliciting, diverting, or accepting any business from any current, former, or prospective patient, referral, client or customer of

Gentiva, for a period of eighteen (18) months following the issuance of an injunction by this Court;

f.   An order enjoining Lilly from hiring or attempting to hire, on Bristol's behalf or on behalf of any other person or entity, any person Gentiva now employs or employed at any point during Lilly's employment with Gentiva, for a period of eighteen (18) months following the issuance of an injunction by this Court;

g.   An order enjoining Lilly to forever refrain from accessing, using, copying, disseminating, or making any use in any way whatsoever of any Gentiva documents, digital files, or material in any form or at any location whatsoever, or the information contained therein;

h.   An order enjoining Lilly to state, under penalty of perjury and within seven days of such order, each occasion whereupon she made any copy of any Gentiva documents, including by identifying the electronic device or location where Lilly placed that copy;

i.   An order enjoining Lilly to state, under penalty of perjury and within seven days of such order, each person or entity she reasonably believes to possess a copy of any Gentiva documents and described how and when any such person or entity received such a copy;

j.   An order enjoining Lilly to identify, under penalty of perjury and within seven days of such order, each electronic device in her household or otherwise in her possession, custody, or control and which is capable of storing Progress documents, and to preserve the contents of those devices without change or alteration;

k. An order enjoining Lilly, within seven days of such order, to produce each electronic device in her household or otherwise in her possession, custody, or control to Gentiva, or a person of the Court's choosing, to examine that device and verifiably and permanently delete all Gentiva documents and information contained thereon;

l. An order enjoining Lilly to provide to Gentiva all work product she has created for any other person or entity since her termination from Gentiva, to produce time sheets or other logs reflecting such work, and to disgorge to Gentiva all compensation she received or is entitled to receive for such work product;

m. An order enjoining Lilly, within seven days of such order, to return all information, documents or electronic communications she removed from Gentiva's property and that remains in her possession, custody or control;

n. An order enjoining Defendants from authorizing, making, or in any way assisting in making, any false or in any way misleading comments or statements regarding the viability, staffing levels, or business operations of Gentiva to any third party who has provided patient referrals to Gentiva in the past five (5) years;

o. An order enjoining Defendants to provide to Gentiva the identities of all patient referrals Bristol has received due to, in whole or in part, the efforts of Lilly or any former Gentiva employees since Lilly began employment with Bristol, and to disgorge to Gentiva all fees, compensation or other remuneration Defendants received or may be entitled to receive for such patient referrals;

3. Compensatory, exemplary and punitive damages;

4. Money damages sufficient to compensate Plaintiffs for their losses;

5.      Maintain jurisdiction over this matter for the purpose of enforcing and overseeing

Defendants' compliance with any injunctive relief issues; and

6.      Reasonable attorneys' fees, interest, costs, expenses, and such other relief as the

Court may deem just and equitable.

Dated: December 5, 2024

/s/ Peter A. Hale
Peter A. Hale

/s/ Shannon R. Linnehan
Shannon R. Linnehan

PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
(207) 791-1100
phale@pierceatwood.com
slinnehan@pierceatwood.com

Attorneys for PLAINTIFFS

## **VERIFICATION**

I, Theresa Nadeau-Stack, verify that I have read the foregoing Verified Complaint and I swear and affirm, subject to the pains and penalties of perjury, and upon personal knowledge or upon information and belief, which I believe to be true, that the facts set forth in the Verified Complaint are true and correct.

Executed on December 4, 2024                    _/s/ Theresa Nadeau-Stack_
                                                Theresa Nadeau-Stack
                                                Area Vice President of Operations and
                                                Business Development, Bristol Hospice